IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE ESTATE OF GARY BRANNON, by and through its administrator Mitchel Brannon, | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 2:24-cv-00683-BL |
| GEOFFREY BLAKE YOUNG, | ) | |
| Defendant. | ) | |

# **MEMORANDUM OPINION AND ORDER**

The Plaintiff, the Estate of Gary Brannon, initiated this action on October 25, 2024, asserting two claims against Defendant Young and against a fictitious defendant:[1] (1) Excessive force in violation of 42 U.S.C. § 1983, and (2) wrongful death under Ala. Code § 6-5-410. This matter is before the court on a motion for summary judgment and a motion to exclude evidence filed by Defendant Geoffrey Blake Young. (Doc. 35). For the reasons set forth below, the Defendant's motions are due to be denied.

[1] The Plaintiff's claims against the fictitious defendant are due to be dismissed. *See Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (affirming the district court's *sua sponte* dismissal of claims against fictitious defendants on the basis that, "[a]s a general matter, fictitious-party pleading is not permitted in federal court.").

## JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## PROCEDURAL HISTORY

In its initial brief opposing the Defendant's motion for summary judgment (doc. 43), plaintiff counsel attempted to rely upon an expert opinion that they obtained two months after the close of the discovery period and which they had never previously disclosed to the Defendant. Thus, on December 22, 2025, the court entered an order stating that it would exclude the expert opinion. (Doc. 50). However, upon further consideration, on May 7, 2026, the court entered an order imposing a different sanction, vacating its previous orders to the extent that they excluded the Plaintiff's expert. (Doc. 69).

The court specifically ordered that plaintiff counsel would bear the expenses incurred by the Defendant (i.e. the reasonable attorney's fees charged by defense counsel) as the result of plaintiff counsel's failure to obtain the expert's opinion within the discovery period and timely disclose it to the Defendant. *See* doc. 69; Fed. R. Civ. P. 16(f)(2). The court ordered plaintiff counsel to produce the full expert report that they intended to use to defend against summary judgment. The court gave the Defendant time to depose the Plaintiff's expert, obtain a rebuttal

expert, and file a supplemental brief in support of its motion for summary judgment in light of the new expert opinion(s). The court also allowed the Plaintiff to file a supplemental response brief responding to any new arguments in the Defendant's supplement and allowed the Defendant to file a reply. During the supplemental briefing, the Defendant filed a motion to exclude the opinion of the Plaintiff's expert under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 83). Both the motion for summary judgment and the motion to exclude are now fully briefed.

## FACTUAL BACKGROUND

The following facts are undisputed: Gary Brannon was arrested on November 8, 2022, for driving under the influence and, as a result, was brought to the Elmore County Jail. (Docs. 1 at 2, 37-1 at 1). Officer Geoffrey Young directed Brannon through the booking process. (Docs. 1 at 3, 37-1 at 2). During the process, Brannon sustained head injuries for which he was hospitalized. (Docs. 1 at 3–4, 36 at 14). Brannon remained in the hospital until his death eight months later on July 8, 2023. (Doc. 37-11 at 1, 36 at 15). The autopsy report of Dr. Reedy listed the manner of death as "Homicide" and the cause of death as "Complications of Blunt Force Head Injury." (Doc. 37-11 at 2). Within this outline of events, the parties fill in the details quite differently.

According to the Plaintiff, the Defendant "brutally beat" Brannon by "repeatedly and viciously str[i]k[ing] [him] on the head." (Doc. 1 at 3). The Plaintiff alleges as follows:

> Officer Geoffrey Blake Young acted without provocation, justification, or reason. At no time did Brannon possess a weapon or pose any threat of danger to Geoffrey Blake Young, or others, which warranted a violent response, of this degree, from Officer Geoffrey Blake Young.
>
> . . . Officer Geoffrey Blake Young's conduct was willful, malicious, intentional, and completely in bad faith as Brannon did nothing to warrant being subjected to such cruel and unconstitutional behavior.

(Doc. 1 at 4).

On the other hand, according to the Defendant, he "struck Mr. Brannon only one time." (Doc. 37-1 at 3). The Defendant's affidavit states that Brannon was non-compliant, intoxicated, and unruly during the booking process, and that Brannon verbally threatened the Defendant before charging at him. (Doc. 37-1 at 2–3). The Defendant asserts that he "delivered a distraction strike" in self-defense and that it "hit Mr. Brannon's face on the bridge of his nose." (Doc. 37-1 at 3). He "did this in the spur of the moment to create distance between [them]." (Doc. 37-1 at 3). "[T]his strike caused Mr. Brannon to fall back and hit his head on the wall behind him." (Doc. 37-1 at 3).

## STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law" based on the materials in the record. Fed. R. Civ. P. 56(a), (c). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is not genuine if it is not supported by any evidence or is created by evidence that is "merely colorable, or is not significantly probative." *Id.* at 249 (citations omitted). The court must view the evidence in the light most favorable to the Plaintiff, drawing all reasonable inferences in its favor. *See Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1186 (11th Cir. 2020). Where there is enough evidence on both sides to create a dispute (i.e. more than a scintilla), the court must resolve that issue of fact in favor of the Plaintiff. *Id.*; *see also Anderson*, 477 U.S. at 252 (holding that, generally, the "mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment).

## DISCUSSION

### I. Motion to Exclude Dr. Shaker's Opinion

Before assessing the merits of the Defendant's motion for summary judgment, the court must first resolve the Defendant's motion to exclude the Plaintiff's evidence (doc. 83). The Plaintiff asserts in his complaint that the Defendant "repeatedly and viciously struck [him] on the head." (Doc. 1 at 3). To support the contention that the Defendant struck Brannon more than once, the Plaintiff offers

the expert opinion of Dr. Adel Shaker. (*See* doc. 82-22). The opinion, which is based on an autopsy of Brannon's body, states, in pertinent part, as follows:

> VI. My Forensic Pathology Opinions
>
> A. Nature, Severity, and Distribution of Injuries
>
> In my medical and forensic pathology opinion, Gary Brannon exhibited severe, complex, and extensive traumatic injuries with significant pathological findings. The severity, distribution, and multiplicity of the traumatic injuries are not adequately explained by a single strike followed only by a fall to the ground.
>
> Specifically, the reported version of events states that Officer Geoffrey Young struck Gary Brannon once and that Mr. Brannon fell to the ground, sustaining a posterior scalp laceration that required immediate medical attention. In my opinion, that description is inconsistent with the full pattern and distribution of the injuries identified.
>
> The pattern of injuries is consistent with multiple episodes of blunt force trauma to the head. Such trauma may occur through repeated strikes with a closed fist, impacts by a blunt object, or other repeated blunt force impacts, depending upon the complete investigative and medical context.
>
> B. Cause of Death: Complications of blunt force trauma to the head.
>
> C. Manner of Death: Homicide
>
> VII. Basis and Reasoning
>
> My opinions are based upon the objective autopsy findings, the medical imaging and hospital course, the documented traumatic intracranial hemorrhages, the skull and facial fractures, the posterior scalp laceration, the operative and post-operative course, and the subsequent medical complications. The injuries include both intracranial hemorrhage and skeletal trauma involving the skull and facial bones.

> The presence of a large left subdural hematoma with midline shift and mass effect, a right temporal subarachnoid hemorrhage, skull base fracture, zygomatic fracture, nasal bone fractures, and posterior scalp laceration reflects significant blunt force trauma. The multiplicity and distribution of these injuries support my opinion that the trauma is not limited to a simple fall mechanism as described in the reported single-strike account.
>
> Gary Brannon required neurosurgical intervention, including craniectomy for evacuation of hematoma and placement of an external ventricular drain. He later required tracheostomy and gastrostomy placement and developed complications including pneumonia and seizures. These medical complications followed the blunt force head trauma and are medically related to the injury sequence described above.
>
> VIII. Conclusion
>
> Based upon my education, training, experience, autopsy findings, review of the medical records, and review of the available investigative materials, it is my opinion to a reasonable degree of medical and forensic pathology certainty that the decedent sustained severe, complex, and extensive blunt force traumatic injuries to the head. The injuries are inconsistent with a single strike followed only by a fall to the ground and are more consistent with multiple blunt force impacts to the head.
>
> It is my further opinion that the cause of death is medical complications of blunt force trauma to the head, and the manner of death is homicide.

(Doc. 82-22 at 3–4).

The Defendant argues that Dr. Shaker's deposition testimony revealed "fundamental deficiencies in methodology, factual foundation, and analytical rigor rendering his opinions inadmissible." (Doc. 83 at 3). Specifically, the Defendant highlights that Dr. Shaker's opinion is based on his interpretation of the injuries and

not a standardized scientific method. (Doc. 82-6 at 37). Indeed, Dr. Shaker testified that he relied on his "education, experience, training, and experience for 30-plus years on the national and international basis," rather than any "publications, articles, treatises, standards, guidelines, or authorities" in forming his opinion. (Doc. 83 at 7; doc. 82-6 at 12). Similarly, when asked about his methodology and the error rate associated with his methodology, Dr. Shaker referred to and described the "geographic distribution" of the injuries. (Doc. 82-6 at 34–35). The Defendant condemns this methodology as "an observational characterization, not a scientific protocol." (Doc. 83 at 7).

In response, the Plaintiff first argues that the methodology, peer-reviewed publication, testing protocol, or error rate involved in an expert's opinion are merely factors a court can consider; "they are not mandatory elements that every expert must satisfy." (Doc. 85 at 11). The Plaintiff notes that Dr. Shaker's opinion is "based upon his firsthand examination of the decedent, objective physical findings, medical records, autopsy evidence, photographs, and the circumstances surrounding the injuries, considered through the lens of his education, training, and more than thirty years of professional experience." (Doc. 85 at 5).

The Defendant's motion also highlights the fact that Dr. Shaker could not state the exact number of impacts Brannon likely received. He opines simply that there were "multiple" impacts. When asked about the number of impacts Brannon

sustained, Dr. Shaker answered "[m]ore than one. I cannot say how many. Might be two. Might be three, might be five" and that it "could be any number." (Doc. 82-6 at 35). According to the Defendant, "[s]uch testimony reflects speculation, not science." (Doc. 83 at 14). The Defendant summarily states that "[i]f Dr. Shaker cannot determine whether there were two impacts or more, there is no measurable or testable methodology supporting the opinion." (Doc. 83 at 14).

In response to this argument, the Plaintiff points out that Dr. Shaker acknowledged "the limitation of his conclusion," and such a limitation "does not establish that the underlying conclusion lacks a factual or professional basis." (Doc. 85 at 17–18). The Defendant's own expert testified that there could be "confluent impact sites . . . two impact sites on top of each other," which are "basically impossible to separate." (Doc. 82-16 at 17). Therefore, the Plaintiff argues, "an exact numerical determination" may not be possible based on the available evidence. (Doc. 85 at 17).

Finally, the Defendant cites *Davis v. Lockheed Martin Corp.*, 183 F.4th 1327, 1334 (11th Cir. 2026), for the proposition that "an expert must do more than invoke experience and point to data—he must explain how his methodology connects the data to the conclusion." (Doc. 83 at 6). The Defendant points out that Dr. Shaker did not consider alternative causes for the injuries observed, citing *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010): "Although a reliable

differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been the sole cause of the plaintiff's injury." (Doc. 83 at 9–13). The Defendant notes several concessions made by Dr. Shaker during his deposition regarding Brannon's lack of protective reflexes and intoxication and states that those facts, which support the Defendant's version of events, were not "rule[d] out" by Dr. Shaker. (Doc. 83 at 10). None of the Defendant's arguments will prevail.

Under Federal Rule of Evidence 702,[2] expert testimony is admissible if:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

---

[2] Federal Rule of Evidence 702 says:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Id.*

The Defendant does not challenge the first or third requirements for admissibility. His arguments relate only to the reliability of Dr. Shaker's opinion.

> The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, identified four non-exhaustive factors that will commonly bear on the second inquiry—i.e., the reliability inquiry:
>
> > (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.
>
> *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam) (citing *Daubert*, 509 U.S. at 593–94, 113 S. Ct. at 2796–97).

*Prosper v. Martin*, 989 F.3d 1242, 1248–49 (11th Cir. 2021).

As a preliminary matter, the court must address the difference between scientific expert testimony and experience-based expert testimony. The Defendant is correct that, "when evaluating the reliability of *scientific* expert opinion, the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'" *Frazier*, 387 F.3d at 1262 (citing *Daubert*, at 592–

93) (emphasis added). However, not all expert testimony is "scientific expert opinion."

In *Kumho Tire Company, Ltd. v. Carmichael*, the Supreme Court granted certiorari to determine "how *Daubert* applies to the testimony of engineers and other experts who are not scientists," to determine "whether, or how, *Daubert* applies to expert testimony that might be characterized as based not upon 'scientific' knowledge, but rather upon 'technical' or 'other specialized' knowledge." 526 U.S. 137, 141, 146–47 (1999). In that opinion, disagreeing with a decision of the Eleventh Circuit, the court concluded that "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 141. The Court's reasoning is instructive:

> Th[e] language [of Rule 702] makes no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. It makes clear that any such knowledge might become the subject of expert testimony. . . .
>
> . . . [T]he evidentiary rationale that underlay the Court's basic *Daubert* "gatekeeping" determination [is not] limited to "scientific" knowledge. *Daubert* pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.,* at 592, 113 S.Ct. 2786 (pointing out that experts may testify to opinions, including those that are not based on firsthand knowledge or observation). The Rules grant that latitude to all experts, not just to "scientific" ones.

Finally, it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory itself may depend for its development upon observation and properly engineered machinery. And conceptual efforts to distinguish the two are unlikely to produce clear legal lines capable of application in particular cases.

Neither is there a convincing need to make such distinctions. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L.Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." *Ibid.* . . .

. . . .

. . . The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert,* nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

*Daubert* itself is not to the contrary. It made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of *Daubert's* general acceptance factor help show that an expert's testimony is reliable where the discipline

itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

At the same time, and contrary to the Court of Appeals' view, some of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony. In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

We must therefore disagree with the Eleventh Circuit's holding that a trial judge may ask questions of the sort *Daubert* mentioned only where an expert "relies on the application of scientific principles," but not where an expert relies "on skill- or experience-based observation." 131 F.3d, at 1435. We do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match.

To say this is not to deny the importance of *Daubert's* gatekeeping requirement. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in *Daubert,* the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special

> briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

In light of the reasoning in *Kumho Tire*, the Eleventh Circuit has adapted the *Daubert* factors for assessing reliability in cases involving experience-based expert testimony. *See Frazier*, 387 F.3d at 1262 ("Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful.") In general, the *Daubert* reliability factors are "illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.*

> These factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, 113 S. Ct. at 2796, and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). The ultimate objective of the inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* The judge "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999) (quotation marks omitted).

*Prosper*, 989 F.3d at 1248–49. "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate

the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d at 1262.

The advisory committee's note to the 2000 amendments to Federal Rule of Evidence 702 provides helpful guidance for the instant scenario:

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.
>
> . . . .
>
> . . . The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. . . .
>
> The amendment requires that the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case. While the terms "principles" and "methods" may convey a certain impression when applied to scientific knowledge, they remain relevant when applied to testimony based on technical or other specialized knowledge. For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.
>
> . . . .

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.

In this case, it appears that the parties disagree about whether Dr. Shaker is providing non-scientific, experience-based testimony, or scientific testimony. The Defendant mainly argues that Dr. Shaker's scientific testimony fails under an analysis of the four factors set forth in *Daubert*, and that his reliance on his experience is insufficient. The Plaintiff, in response, highlights that experience-based testimony is permissible and may be evaluated using other factors. The Defendant does acknowledge in his motion that "[a]n expert who relies on experience alone is not automatically disqualified," but he still argues that Dr. Shaker's opinion fails the reliability test because an "expert must explain how experience leads to a reliable conclusion and how it is reliably applied to the particular facts." (Doc. 83 at 8).

Ultimately, the court finds that Dr. Shaker's opinion is experience-based and is sufficiently reliable to be presented to a jury. Dr. Shaker pointed specifically to the fracture in the base of Brannon's skull to support his conclusion that the injuries were inconsistent with one strike to the face and a fall; he explained that the bone in the base of the skull is "sturdy" and, in his experience, an injury to that bone is more consistent with a fall from a two-story building or a head-on vehicle collision. (Doc.

82-6 at 17–18, 34, 36–37, 39). When asked what scientific methodology he relied on, Dr. Shaker again explained that his experience dictated that the injuries were not likely to come from the force described by the Defendant; in particular, the geographic distribution of the injuries and the sturdiness of the injured bones (specifically the base of the skull and the zygomatic face bone[3]) led Dr. Shaker to the conclusion that the injuries "cannot be explained by simple punch to the nose or to the head. So it has to be multiple times"; "[Brannon] ha[d] been exposed to multiple blunt force trauma, whether that closed fist or a baton, or whatsoever, blunt force injury." (Doc. 82-6 at 18, 34, 39). Regarding the geographic distribution of the injuries, Dr. Shaker explained that the placement of the injuries "on the right and left side, on the back of the head and the base of the skull, in the nose, and the zygomatic bone, the face bone," led him to conclude that Brannon had to have suffered more than one strike and a fall from his own height. (Doc. 82-6 at 18, 34, 39). He also testified that the fact that there was "extensive subdural hematoma, majority on the left and a little bit on the right [which was] subarachnoid," was inconsistent with one strike and a fall because "[t]his needs a very strong blunt force trauma." (Doc. 82-6 at 37). When asked whether he relied on any peer-reviewed

[3] In support of his motion for summary judgment, the Defendant notes that his expert testified that these bones are not sturdy. (Doc. 81 at 21; *see* doc. 82-2 at 7). The court will not engage with this argument. To weigh and decide between the experts' contrasting opinions would go beyond the court's duty to assess the reliability of the Plaintiff's expert and, as set forth below, to determine whether there is a genuine dispute of material fact.

literature, he answered: "the textbooks, which I studied in residency and fellowship on regular basis, everything—every textbooks says that has to be multiple blunt force trauma, if it is extensive injuries to the head." (Doc. 82-6 at 34).

While the field of forensic pathology is obviously a science involving testable methodologies, Dr. Shaker clearly testified that his opinion in this case was based on his knowledge and experience; his methodology was to compare the injuries he observed with his knowledge of what events typically produce such injuries. The Supreme Court has made clear that expert testimony like this can be reliable. Thus, to the extent the Defendant's motion to exclude hinges on Dr. Shaker's failure to name a specific scientific method he used to arrive at his conclusion, the Defendant's motion fails. The Defendant's motion is right, though, to demand an explanation as to "how [Dr. Shaker's] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *See* Fed. R. Evid. 702, advisory committee's note to 2000 amend. But the court finds that Dr. Shaker has provided this explanation.

According to the Defendant, Dr. Shaker "has offered no explanation of what principles, within his 30 years of experience, lead him to distinguish multi-blow injury patterns from single-impact-plus-fall patterns. He has identified no analytical framework, no checklist, no protocol, and no error-testing mechanism." (Doc. 83 at 7–8). While he did not identify a checklist, protocol, or error-testing mechanism,

Dr. Shaker did cite the specific characteristics of the injuries that led him to conclude that they were inconsistent with the events described by the Defendant. He cited the nature of the injured bones and the severity to support his conclusion that they could not have been caused by one strike and a fall. This explanation is sufficient in the court's view.

Like in *Kumho Tire*, the court cannot test the reliability of Dr. Shaker's methodology by reviewing its error rate or asking whether it has been subjected to peer review and publication; the court must ask better-fitted questions. To evaluate the reliability of Dr. Shaker's experience-based testimony, the court will examine whether Dr. Shaker's experience-based methodology is generally accepted in the forensic pathology community and whether his preparation is of a kind that others in this field would recognize as acceptable. *See Kumho Tire Co.*, 526 U.S. at 151. When asked what the standard methodologies are for forensic pathologists, the chief medical examiner for the state of Alabama and expert retained by the Defendant, Dr. Reedy, responded, "I'm not sure I can quantify that because it's all a matter of training and experience. You're trained to do an autopsy in a certain way. Most forensic pathologists will do an autopsy the same way every other forensic pathologist does it. I was trained . . . to utilize every information source possible—in this case, medical records—before coming to a definitive conclusion." (Doc. 82-2 at 17); (*See also* doc. 85 at 19). Dr. Reedy specifically commended Dr. Shaker for

waiting to review the medical records before completing his autopsy report, stating: "That was the right thing to do." (Doc. 82-2 at 15). So, Dr. Shaker reviewed the medical records and performed an autopsy, and then relied on his training and experience to reach conclusions about what could have caused Brannon's injuries. This is the same approach taken by the Defendant's experts, and it appears to be accepted in the field of forensic pathology.

The Defendant attempts to distinguish Dr. Shaker's approach from the approach his two experts took, noting that Dr. Uribe based his conclusion (that the fracture in the base of the skull could be caused by the impacts described by the Defendant) on "peer-reviewed literature demonstrating a direct, biomechanical association between zygomatic-arch fractures and temporal-bone/skull-base fractures through force-transmission pathways." (Doc. 83 at 11). The Defendant asserts that the literature "supplies precisely the analysis Dr. Shaker never performed." (Doc. 83 at 11). Regarding Dr. Reedy, the Defendant simply sets forth Dr. Reedy's explanation for how the single strike and backward fall account for every one of Brannon's injuries. Neither of these points establish that Dr. Shaker's experience-based opinion is unreliable. As explained above, there is no requirement in the case law that an expert must rely on peer-reviewed literature. Dr. Shaker explained how he reached his conclusion based on his expertise. The court finds no significant difference between the experts' approaches, and it is not for this court to

weigh the quality of the expert opinions against one another. Their competing interpretations should be presented to the fact-finder.

The Defendant argues that Dr. Shaker's analysis is "far less rigorous than the methodology found wanting in *Davis* [*v. Lockheed Martin Corp.*, 183 F.4th 1327, 1335 (11th Cir. 2026)]." (Doc. 83 at 8). But *Davis* concerned a causation opinion, that is, an expert opinion declaring the cause of something, and ruling out other possibilities. This is not the type of opinion Dr. Shaker offers. Dr. Shaker concludes merely that the injuries *could not have been caused* by one strike and a fall because they required more impacts. This is a much more narrow conclusion.

The Defendant argues that Dr. Shaker utilized the unreliable principle that "multiple injuries equals multiple blows," (Doc. 83 at 8) and notes Dr. Reedy's testimony that forensic pathologists do not determine the number of impacts simply by counting the number of injuries. (Doc. 82-2 at 15). But Dr. Shaker's conclusion was not based on such a simple principle. He testified that he considered which bones were injured and the geographic distribution of the injuries, not merely their number. Moreover, Dr. Shaker's inability to determine the exact number of impacts does not render his opinion that the injuries were inconsistent with one strike and a fall inadmissible as a matter of law. Again, to determine the exact number of impacts that caused certain injuries is a far greater task than simply determining whether one strike and a fall could have caused the injuries. Dr. Shaker explained clearly why

he ruled out the possibility of one strike and a fall; he need not have an exact picture of the sequence of events to lend reliability to his limited conclusion. The Defendant can draw out the limitations of Dr. Shaker's narrow opinion on cross-examination.

Finally, Dr. Shaker's opinion is not unreliable just because he did not "rule out" the facts the Defendant relies on to support his version of events, i.e. Brannon's lack of protective reflexes and intoxication. Dr. Shaker expressly considered the possibility that Brannon's injuries were caused by a single strike and a fall to the ground and testified explicitly that some of the injuries could have been caused by those impacts (doc. 82-6 at 39) but ultimately found no way to square the injuries with that explanation because of their severity. Because Dr. Shaker's opinion is limited to ruling out the Defendant's version of events, he need not rule out any other possible explanations. It is important to note that whether an expert opinion's

> logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility. On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.
>
> . . . [A]s long as a logical basis exists for an expert's opinion and the inadequacies are fully disclosed to the jury, the weaknesses in the underpinnings of the opinion, go to the weight and not the admissibility of the testimony.

*Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) (citations omitted). The court will not exclude Dr. Shaker's opinion.

**II. Excessive Force—42 U.S.C. § 1983**

Having resolved the evidentiary issue, the court now turns to examine the merits of the Defendant's motion for summary judgment. The court will address each claim in turn. First, the Plaintiff alleges that "Officer Geoffrey Blake Young used excessive force upon [him] and thereby violated his Fourteenth Amendment Due Process right to be free from excessive physical force." (Doc. 1 at 4). The Defendant argues that he is entitled to qualified immunity with respect to the Plaintiff's excessive force claim. "Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). It is undisputed in this case that the Defendant was engaged in his discretionary duties at all relevant times. *See Balbin v. Johnson*, No. 22-11182, 2025 WL 883064, at *2 (11th Cir. Mar. 19, 2025) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)) ("An officer's actions are discretionary if 'they are of a type that fell within [his] job responsibilities.'"). Therefore, the burden has shifted to the Plaintiff to show that the Defendant is not entitled to qualified immunity. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). To satisfy this burden,

> the plaintiff must demonstrate (taking all the facts in the light most favorable to [him]) the following two things: (1) that the defendant violated [his] constitutional rights, and (2) that, at the time of the violation, those rights were "clearly established . . . in light of the

> specific context of the case, not as a broad general proposition[.]" *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled, in part, on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings." *Jones*, 857 F.3d at 851.

*Gaines*, 871 F.3d at 1208. The Plaintiff has met this burden.

**A. Constitutional Violation**

To establish a violation of the Fourteenth Amendment in an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397–98 (2015).

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Whether the Defendant struck Brannon more than once is the key factual issue in this case because if a juror found that there was more than one strike, the juror would likely find that the additional strike(s) were excessive force because it is undisputed that, after hitting his head on the wall, Brannon fell to the ground. Thus, he did not fight back, resist, or pose any threat to the Defendant that would justify

any use of force after the fall. This means that any additional strike by the Defendant would be excessive even if his assertions about Brannon's noncompliance, threats, and intoxication were all found to be true.

The Defendant argues that Dr. Shaker's opinion is insufficient evidence to support a finding that the Defendant struck Brannon more than once. The court agrees that, while the opinion clearly asserts that Brannon suffered more than one strike and one impact against a wall, believing that opinion would not necessarily *require* the conclusion that *the Defendant* struck Brannon more than once. Nevertheless, believing Dr. Shaker's opinion would supply sufficient circumstantial evidence from which a reasonable juror could make that inference.

The opinion of Dr. Shaker need not, on its own, directly prove that the Defendant struck Brannon after he fell to the ground. It is undisputed that the Defendant and Brannon were the only actors in the room when Brannon sustained the injuries that led to his death. Also, the Defendant admits that Brannon fell to the ground after one strike. In light of that factual background, Dr. Shaker's opinion that Brannon suffered more than one strike and one impact with the wall[4] is sufficient

[4] The Defendant argues that Dr. Shaker's use of the word "multiple" could simply mean "more than one," and would thus be consistent with the Defendant's story. (Doc. 81 at 23–25). The Defendant writes: "[E]ven if the record is described as containing more than one 'impact,' that does not establish more than one use of force: the admitted punch was one impact, and the resulting contact with the wall or floor was another, equaling Dr. Shaker's 'multiple' impacts." (Doc. 81 at 22). The Defendant points out that, when asked in his deposition if he could exclude the possibility that Brannon hit his head multiple times on the wall or on the floor, Dr. Shaker responded "I was not at the scene. I can't exclude anything." (Doc. 82-6 at 37). When asked how many impacts

circumstantial evidence on which a reasonable juror could conclude that *the Defendant himself* struck Brannon more than once. There is no other evidence as to how Brannon could have sustained additional impacts to his head after falling to the ground. While a juror would have to make a small leap in his or her reasoning, that leap would be a logical and permissible inference to make based on the circumstantial evidence.

> An inference must be "reasonable" to defeat a motion for summary judgment. *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982). A reasonable inference is one that a "reasonable and fair-minded [person] in the exercise of impartial judgment might draw from the evidence." *Id.* (internal quotation marks omitted). Reasonable inferences may rest in part on conjecture, "for an inference by definition is at least partially conjectural." *Id.* But a jury cannot be "allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Id.* "Such an inference is infirm because it is not based on the evidence." *Id.*

*Pussinen v. Target Corp.*, 731 F. App'x 936, 938 (11th Cir. 2018). When viewed in the light most favorable to the Plaintiff, and drawing all reasonable inferences in the Plaintiff's favor, the court finds that the evidence that the Defendant suffered more

---

occurred to Brannon, Dr. Shaker responded "[m]ore than one. I cannot say how many. Might be two. Might be three, might be five." (Doc. 82-6 at 35). Dr. Shaker also testified that some of Brannon's injuries were consistent with a strike to the face and an impact to the back of the head by a wall. (Doc. 82-6 at 39). Ultimately, the court disagrees with the Defendant's interpretation. Dr. Shaker's report says explicitly that "[t]he injuries are inconsistent with a single strike followed only by a fall to the ground and are more consistent with multiple blunt force impacts to the head." (Doc. 82-22 at 4). Thus, logically, Dr. Shaker's use of the term "multiple" was intended to mean more than the two impacts the parties agree on. He clarified in his deposition that "multiplicity says that it is not simple punch to the head or force to the back of the head." (Doc. 92-6 at 19).

than one strike and a fall (i.e. Dr. Shaker's expert opinion) is sufficient to support a finding that the Defendant struck Brannon more than once.

On these facts, the court further finds that the *Kingsley* reasonableness factors weigh in favor of concluding that the Plaintiff has established a constitutional violation. *See id.* at 381 ("[O]nce we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of [the Defendant's] actions . . . is a pure question of law."). Most of the factors clearly weigh in the Plaintiff's favor. There is evidence to support a finding that the Defendant struck Brannon after he fell to the ground. Once Brannon fell to the ground, there was no threat to the Defendant nor security problem at issue, Brannon was not resisting, and the Defendant did not limit his use of force to what was necessary because no force was necessary at that point.

The only remaining factor is the extent of Brannon's injury. Regarding this factor, the Eleventh Circuit has explained as follows:

> We don't think the *Kingsley* Court meant to suggest that unforeseeable injuries can transform a reasonable application of force into an excessive one. *Cf. Wilkins v. Gaddy*, 559 U.S. 34, 34, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (instructing lower courts "to decide [Eighth Amendment] excessive force claims based on the nature of the force rather than the extent of the injury"). But resulting injuries can be an indicator, however imperfect, of the severity of the force that caused them. *Cf. McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019) ("The extent of injury is relevant to the Eighth Amendment inquiry because it provides some indication of the amount of force applied, and because it may suggest whether the use of force was plausibly necessary in a particular situation . . . .").

*Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1184 (11th Cir. 2020).

It is undisputed that the Defendant's strike to Brannon's face caused Brannon to "fall back and hit his head on the wall behind him" (doc. 37-1 at 3) and that Brannon suffered a two-and-a-half-inch laceration on the back of his head as a result of that fall. (Doc. 36 at 14). It is also undisputed that Brannon was unresponsive immediately following the altercation with the Defendant and was bleeding from his head. (Doc. 37-9). Brannon's cause of death was ruled "complications of blunt force head injury." (Doc. 37-11 at 2). Nevertheless, the Defendant does not concede that the injuries Brannon sustained in the jail caused Brannon's death. (*See* Affidavit of Defendant Young, doc. 37-1 at 3) ("It is my understanding that Mr. Brannon's injuries could also have been caused by the car wreck he was in earlier in the night, which resulted in his arrest for driving under the influence."). The Plaintiff's evidence (the expert opinion of Dr. Reedy) establishes that Brannon arrived at the hospital with two fractures and several hemorrhages. (Doc. 43-3 at 1). According to the incident report prepared on the day of the altercation, the car wreck in which Brannon was involved consisted of Brannon striking two vehicles in a parking lot. (Doc. 37-5 at 3). While it is possible that Brannon sustained invisible injuries from the car wreck that went unobserved during his arrest, the court must draw all reasonable inferences in the Plaintiff's favor. In doing so, the court concludes that the injuries Brannon sustained in the jail caused his death.

**B. Clearly Established**

In 2008, the Eleventh Circuit decided *Danley v. Allen*, writing:

> When jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive. *See Bozeman,* 422 F.3d at 1272 (giving special weight to the fact that the jailers "continued [to] use ... force in a manner that was severe enough to render [the plaintiff], at the very least, unconscious after [he] had surrendered"); *Skrtich,* 280 F.3d at 1303 ("[G]overnment officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated."); *see also Harris v. Chapman,* 97 F.3d 499, 505–06 (11th Cir.1996); *Davis v. Locke,* 936 F.2d 1208, 1212–13 (11th Cir.1991); *Williams v. Cash–C.O.I.,* 836 F.2d 1318, 1320 (11th Cir.1988); *Perry v. Thompson,* 786 F.2d 1093, 1093–95 (11th Cir.1986); *cf. Vinyard,* 311 F.3d at 1348. Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.

540 F.3d 1298, 1309 (11th Cir. 2008). The Plaintiff's version of events says that Brannon was incapacitated on the floor after the Defendant's initial strike, and then the Defendant struck Brannon at least once more. If true, that would constitute a violation of Brannon's clearly established rights. Thus, there is a genuine dispute of material fact precluding the application of qualified immunity on the excessive force claim.

## III. Wrongful Death—Ala. Code § 6-5-410

The Defendant asserts that the Plaintiff lacks evidence that he acted "willfully, maliciously, fraudulently, in bad faith, beyond [his] authority, or under a mistaken interpretation of the law" so as to show that he is excepted from state-agent immunity

on the wrongful death claim. (Doc. 36 at 27–31). The Defendant also argues that, because the Plaintiff cannot establish a Fourteenth Amendment violation, he is entitled to jailer immunity, as "jailers are covered under the Jailer Act so long as two conditions are present: they are 'acting within the line and scope of their duties and are acting in compliance with the law.'" (Doc. 36 at 31–32) (quoting *Young v. Myhrer*, 243 F. Supp. 3d 1243, 1253 (N.D. Ala. 2017)). The Defendant also argues that there is no evidence that he breached a duty to the Plaintiff and thus there is no dispute of material fact as to the wrongful death claim. (Doc. 36 at 32–34). Finally, the Defendant challenges the Plaintiff's evidence of causation, noting that Dr. Shaker's opinion does not directly establish that the Defendant struck Brannon more than once. (Doc. 81 at 32–34).

In light of the court's conclusion above that the Plaintiff has a viable § 1983 claim for a Fourteenth Amendment violation, the Defendant is not entitled to summary judgment on the Plaintiff's wrongful death claim. The court has already found that a juror could make a reasonable inference based on Dr. Shaker's opinion that the Defendant struck Brannon more than once. "[W]hen a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala.Code § 6–5–410." *Est. of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011). Jailer immunity and state-agent immunity "do not immunize . . . guards from liability

under state law if they violated [a pretrial detainee's] constitutional rights." *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019).

## CONCLUSION

It is **ORDERED** as follows:

1. The Plaintiff's claims against the fictitious defendant are **DISMISSED** with prejudice.

2. The Defendant's Motion to Exclude (doc. 83) is **DENIED**.

3. The Defendant's Motion for Summary Judgment (doc. 35) is **DENIED**.

**DONE** and **ORDERED** on this the 25th day of September, 2026.

BILL LEWIS
UNITED STATES DISTRICT JUDGE